**PORTALE RANDAZZO**
Richard A. Portale
rportale@portalerandazzo.com
245 Main Street
White Plains, NY 10601

**SAMINI BLOCK APC**
Bobby Samini (*pro hac vice pending*)
bobby.samini@saminilaw.com
Benjamin M. Cutchshaw (*pro hac vice pending*)
benjamin.cutchshaw@saminilaw.com
650 Town Center Drive, Suite 1500
Costa Mesa, California 92626
Telephone: (949) 724-0900

*Attorneys for Plaintiff*
FLOYD MAYWEATHER, JR.

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FLOYD MAYWEATHER, JR., an individual,<br><br>            Plaintiff,<br><br>    v.<br><br>DANIEL GEIGER, an individual; INSIDER, INC., a Delaware corporation; and DOES 1–100, inclusive,<br><br>            Defendants. | CASE NO. _____<br><br>**COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

# INTRODUCTION

1. Floyd Mayweather, Jr., a celebrated athlete and entrepreneur, has consistently demonstrated integrity and transparency in his business dealings, particularly in his ventures into real estate, which aim to empower communities through his substantial investments. Despite his commendable efforts, Daniel Geiger, a reporter for Business Insider, has embarked on a campaign of harassment and defamation, characterized by aggressive and misleading journalism that not only distorts the truth but seems driven by a deep-seated bias against Mr. Mayweather's success. Mr. Geiger's articles, filled with inaccuracies and devoid of any substantive evidence, have been published despite clear refutations and corrections provided by Mr. Mayweather's team. This pattern of behavior reveals a reckless disregard for the truth, aimed at tarnishing Mr. Mayweather's reputation and undermining his business efforts, which have been nothing short of transformative for many underserved communities. The actions of Mr. Geiger, repeated despite multiple notices and corrections, compel us to seek redress through this court to uphold Mr. Mayweather's rights and rectify the injustices he has endured.

2. Specifically, beginning in March 2025, Daniel Geiger, a reporter employed by Business Insider, Inc. ("BI"), undertook a calculated campaign to undermine Mr. Mayweather's ventures and humiliate Mr. Mayweather publicly. Mr. Geiger bombarded Mr. Mayweather's partners, employees, friends, and family with **hundreds** of hostile telephone calls, misrepresented himself, ignored documentary proof of ownership, and then published demonstrably false statements portraying Mr. Mayweather as a fraud who "exaggerates" his holdings.

3. Mr. Geiger acted with actual malice. He refused to review closing documents offered to him, never visited the buildings owned by Mr. Mayweather's portfolio, distorted off-the-record remarks, and relied on unnamed "sources" (some of who had personal vendettas against Mr. Mayweather) whose assertions were

1  facially inconsistent with documents Mr. Geiger was provided, but refused to
2  review. Mr. Geiger also displayed clear racial bias. Anecdotally, among the 281
3  Instagram accounts he follows, fewer than one percent are Black, and multiple
4  witnesses have heard Mr. Geiger deride Mr. Mayweather as an "uneducated
5  dropout" who "shouldn't own New York real estate."

6     4.     Mr. Geiger's March 31, 2025 BI article—"Floyd Mayweather Jr.
7  bragged about a $400 million property deal. There's just one problem."—has
8  already caused (a) lost lease opportunities, (b) emergency rent-freeze concessions,
9  (c) reputational injury exceeding tens of millions of dollars, and (d) severe
10 emotional distress.

11     5.     Mr. Mayweather now sues Defendants in the state whose laws they
12 invoked, under New York common and statutory law.

## PARTIES

14     6.     Plaintiff Floyd Mayweather, Jr. is an individual with a domicile in Las
15 Vegas, Nevada.

16     7.     Defendant Daniel Geiger is an individual with a domicile in New
17 York, New York.

18     8.     Defendant Insider, Inc. is a Delaware corporation with its principal
19 place of business at 1 Liberty Street, New York, NY, 10006, and is therefore
20 considered a citizen of New York for jurisdictional purposes.

21     9.     Plaintiff is ignorant of the true names of Does 1–20 and will amend
22 when their identities are learned.

## JURISDICTION

24     10.     This Court has subject matter jurisdiction over the claims presented in
25 this complaint pursuant to the laws of the State of New York. The claims arise
26 under state law and involve legal principles and statutes applicable within the State
27 of New York, thereby vesting jurisdiction in this Court.

28

11. This Court has personal jurisdiction over the Defendants because the Defendants reside in, conduct business in, or have committed actionable offenses within the State of New York. The actions that give rise to this complaint occurred within New York, and as such, Defendants have sufficient minimum contacts with New York to permit this Court to exercise personal jurisdiction in accordance with the due process principles established by the United States Constitution.

## GENERAL ALLEGATIONS

12. Plaintiff has invested hundreds of millions of dollars in real estate holdings in New York, including affordable-housing properties in Upper Manhattan.

13. Transaction documents confirm Mr. Mayweather's ownership and control interests in the real-estate portfolios involved.

14. From March 3 to March 15, 2025, Mr. Mayweather and his advisors repeatedly invited Mr. Geiger to examine the executed transaction documents validating the legitimacy of Mr. Mayweather's holdings.

15. Mr. Geiger **refused** every invitation to review the materials.

16. Throughout March 2025, Mr. Geiger placed **hundreds** of calls to Mr. Mayweather's advisors, CFO, property managers, leasing agents, and even personal friends and relatives. Many calls occurred past 10 p.m. Eastern. When recipients asked Mr. Geiger to stop, he persisted.

17. On March 19, 2025, Mr. Geiger twice spoke with advisor James McNair. After McNair terminated the call, Mr. Geiger rang back and accused McNair of being an "imposter" and threatened to publish that McNair's voice "doesn't match." Mr. Geiger later printed that insinuation in the article.

18. Several witnesses (Frist, McNair, and others) attest that Mr. Geiger remarked:

    a. "I don't see how a school-dropout boxer winds up buying these properties,"

      b. Mr. Mayweather "should stick to sneakers and watches," and

      c. "Real estate is run by educated people who earned their way."

19. Mr. Geiger further asked Frist, "How did you end up working for a Black guy in real estate?"

20. A March 25 2025 screen capture of Mr. Geiger's public Instagram shows that, out of 281 accounts he follows, only five belong to Black individuals—three of which are Mr. Mayweather's official pages.

21. Further fueling Mr. Geiger's animus, Mr. Mayweather has repeatedly and publicly voiced support for both (i) President Donald J. Trump and (ii) the State of Israel—positions he restated during nationally televised interviews. Multiple witnesses attest that Mr. Geiger declared he was "vehemently anti-Trump," stated he "can't stand anyone waving the MAGA flag," and mocked Mr. Mayweather for "parroting right-wing talking points about Israel." Mr. Geiger's admitted antipathy toward Trump supporters, coupled with Mr. Mayweather's outspoken endorsements, supplied an additional, improper motive for Mr. Geiger's defamatory narrative and underscores his actual malice.

22. Despite the undisputed documentation offered, Business Insider published Mr. Geiger's piece titled "Floyd Mayweather Jr. bragged about a $400 million property deal. There's just one problem." The article falsely states, *inter alia*, that:

      a. "There is no evidence there has been a sale."

      b. Mr. Mayweather "purchased only a small minority ownership interest."

      c. Mr. Mayweather's real-estate claims are "exaggerated."

      d. NYCHP "has not been advised of any sale."

23. Every statement above is materially false. Mr. Geiger possessed—or maliciously ignored—documents disproving each assertion.

24. Several institutional capital partners contacted Mr. Mayweather's team to "confirm whether Floyd really owns anything," delaying separate equity raises costing Plaintiff millions of dollars in potential investments.

25. Between 2020 and 2024, Mr. Geiger authored opinion pieces lamenting the near-absence of Blacks in NYC commercial real estate, repeatedly inferring that major transactions by Black investors are publicity stunts.

26. Mr. Geiger never disclosed that bias nor sought comment from any of the Portfolio's minority tenants—despite Mr. Mayweather's team providing contact information for them.

27. Industry analysts estimate that rumors of ownership exaggeration can suppress property valuations by 5–10%. Applying even a 5% discount to Mr. Mayweather's holdings questioned by Mr. Geiger yields an additional $21.3 million in damage.

28. Mr. Geiger's refusal to review offered documents, reliance on unnamed sources contradicting public filings, racial bias, and admitted knowledge of the $85 million wire satisfy the "actual malice" standard.

29. Moreover, the volume, tone, and timing of Mr. Geiger's calls—after multiple "do-not-call" requests—meet the "repeated conduct" threshold for intentional infliction and prima facie tort under New York law.

30. Mr. Geiger's remarks about Mr. Mayweather's race, education, and political views demonstrate improper motive, supporting punitive damages.

31. Responsible reporters routinely (a) review transaction documents, (b) search UCC and option filings, and (c) seek on-site tenant verification before calling a public figure a liar. ***Mr. Geiger did none of these***.

## FIRST CAUSE OF ACTION

### Defamation (Libel & Libel per se)
*(Against All Defendants)*

32. Plaintiff realleges and incorporates by reference the foregoing paragraphs of this Complaint.

33. Defendants published false statements of fact about Plaintiff's ownership, honesty, and business acumen.

34. The statements are defamatory per se because they impute dishonesty and injure Plaintiff in his trade.

35. Defendants acted with "actual malice."

36. Plaintiff has suffered special damages, including but not limited to (a) lost rental income and deal flow and (b) costs to mitigate reputational harm, in an amount to be proven at trial but not less than $100,000,000, plus presumed damages, punitive damages, and costs.

## SECOND CAUSE OF ACTION

### Intentional Infliction of Emotional Distress / Harassment
*(Against Defendant Geiger)*

37. Plaintiff realleges and incorporates by reference the foregoing paragraphs of this Complaint.

38. Mr. Geiger's relentless, deceitful, racially-charged calling spree and public disparagement constitute extreme and outrageous conduct beyond all bounds of decency.

39. Mr. Geiger intended to—and did—inflict severe emotional distress on Mr. Mayweather.

40. Plaintiff is entitled to compensatory and punitive damages, as well as injunctive relief to stop further harassment.

### THIRD CAUSE OF ACTION

### Prima Facie Tort (Malicious Harassment)
*(Against All Defendants)*

41. Defendants engaged in intentional, malicious acts without justification, motivated by spite and racial animus, causing special damages in excess of $100 million.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment:

A. For general, special, and presumed damages not less than $100,000,000;

B. For punitive/exemplary damages;

C. For a public retraction with equal prominence;

D. For a permanent injunction barring Daniel Geiger from further harassing communications and defamatory publications he knows to be or recklessly disregards as false;

E. For attorneys' fees and costs where permitted by law;

F. For pre- and post-judgment interest; and

G. For such other relief as the Court deems just and proper.

### JURY DEMAND

42. Plaintiff demands trial by jury on all issues so triable.

Dated: April 30, 2025                    PORTALE RANDAZZO

By: _____
Richard Portale