UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

FLOYD MAYWEATHER, JR., an individual,

                              Plaintiff,

                - against -

DANIEL GEIGER, an individual; INSIDER, INC., a Delaware corporation; and DOES 1-100, inclusive,

                       Defendants.

--------------------------------------------------------------- x

Case No. 1:25-cv-03617-JPO

**ANSWER TO COMPLAINT AND COUNTERCLAIM OF DEFENDANTS**

Defendants Daniel Geiger ("Mr. Geiger") and Insider, Inc. ("Insider") together, ("Defendants"), by and through its undersigned attorneys, Davis Wright Tremaine, LLP, hereby answers the complaint of Plaintiff Floyd Mayweather, Jr. ("Plaintiff" or "Mr. Mayweather") (the "Complaint"), as follows:

## **INTRODUCTION**

1.      Defendants admit that Mr. Mayweather is a well-known athlete and that Mr. Geiger is a reporter for Business Insider.  Defendants deny the remaining allegations in Paragraph 1.

2.      Defendants admit that Mr. Geiger began investigating Mr. Mayweather's real estate holdings in New York in March 2025.  Defendants deny the remaining allegations in Paragraph 2.

3.      Defendants deny each and every one of the allegations in Paragraph 3.

4.      Defendants deny each and every one of the allegations in Paragraph 4.

5.      Defendants admit that Mr. Mayweather has sued Defendants under New York common law, but deny the remaining allegations in Paragraph 5.

**PARTIES**

6.      Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 6 and on that basis, deny each and every one of those allegations.

7.      Defendants admit the allegations in Paragraph 7.

8.      Defendants admit the allegations in Paragraph 8.

9.      Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 9 and on that basis, deny each and every one of those allegations.

**JURISDICTION**

10.     Paragraph 10 contains legal conclusions that do not require a response.  To the extent a response is required, Defendants do not–at this time and for purposes of this case only–contest that this Court has subject matter jurisdiction over these claims.

11.     Paragraph 11 contains legal conclusions that do not require a response.  To the extent a response is required, Defendants do not–at this time and for purposes of this case only–contest that this Court has personal jurisdiction over them.  Defendants deny that it committed actionable offenses within the State of New York.

**GENERAL ALLEGATIONS**

12.     Defendants lack information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 12 and, on that basis, deny each and every one of those allegations.

13.     Defendants lack information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 13 and, on that basis, deny each and every one of those allegations. As explained in Paragraph 14, Mr. Geiger requested "proof of [Mr. Mayweather's] acquisition," but was not provided any documentation.

2

14.    Defendants deny each and every one of the allegations in Paragraph 14. Mr.
Mayweather refused to be interviewed for the piece and never communicated directly with
Defendants.  On March 20, 2025, Mr. Geiger explicitly asked Mr. Ayal Frist, one of Mr.
Mayweather's representatives, if  he could "provide some proof of [Mr. Mayweather's]
acquisitions," but Mr. Frist claimed not to have these documents and instead referred Mr. Geiger
to Black Spruce, the real estate firm from which Mr. Mayweather allegedly purchased the
majority of the apartment portfolio. *See* Ex. 1 at 1.  Indeed, these allegations are not only false,
but they also appear to be made without any reasonable inquiry into the facts.  *See* Letter from
Defendants' counsel to Plaintiff's counsel seeking any basis for these claims, which is attached
as Exhibit 2.  Plaintiff's counsel never responded to that letter.

15.    Defendants deny each and every one of the allegations in Paragraph 15.  *See*
response to Paragraph 14.

16.    Defendants admit that, during the course of his newsgathering, Mr. Geiger called
Mr. Mayweather's advisors and others to provide them with ample opportunity to deny or
otherwise respond to Mr. Geiger's reporting.   Defendants deny Mr. Geiger placed "hundreds" of
calls or that "many calls occurred past 10 p.m. Eastern," and deny the remaining allegations in
Paragraph 16.

17.    Defendants deny that Mr. Geiger ever spoke to Mr. McNair and deny that he ever
called Mr. McNair back to say he was an "imposter."  Rather, on March 20, 2025, Mr. Geiger
had one call with someone purporting to be Mr. McNair.  Mr. Geiger did not accuse the speaker
of being an "imposter."  Rather, Mr. Geiger stated "I don't believe that you're James McNair.
You don't sound anything like James McNair." Mr. Geiger then repeatedly asked if the person
claiming to be Mr. McNair would join a zoom call so that Mr. Geiger could determine exactly

3

who he was speaking to.  The person claiming to be Mr. McNair refused the request. Defendants

respectfully refer the Court to the transcript of Mr. Geiger's call.  *See* Ex. 3.  As to the allegation

about what was printed in the article, Defendants respectfully refer this Court to the full text of

the March 31, 2025, Business Insider Article, "Floyd Mayweather Jr. bragged about a $400

million property deal. There's just one problem" (the "Article") referenced in Paragraph 4 and

attached as Exhibit 4, for its full content and meaning.

18.    Defendants deny each and every one of the allegations in Paragraph 18 and

respectfully refer the Court to Exhibits 3 and 5, which are transcripts of Mr. Geiger's recorded

calls with Ayal Frist and someone purporting to be James McNair, for their full content and

meaning.  Indeed, these allegations are not only false, but they also appear to be made without

any reasonable inquiry into the facts.  *See* Letter from Defendants' counsel to Plaintiff's counsel

seeking any basis for these claims, which is attached as Exhibit 2.  Plaintiff's counsel never

responded to that letter.

19.    Defendants deny each and every one of the allegations in Paragraph 19 and

respectfully refer the Court to Exhibits 3 and 5, which are transcripts of Mr. Geiger's recorded

calls with Ayal Frist and someone purporting to be James McNair, for their full content and

meaning.  Indeed, these allegations are not only false, but they also appear to be made without

any reasonable inquiry into the facts.  *See* Letter from Defendants' counsel to Plaintiff's counsel

seeking any basis for these claims, which is attached as Exhibit 2.  Plaintiff's counsel never

responded to that letter.

20.    Defendants lack knowledge or information as to whether Plaintiff looked at Mr.

Geiger's Instagram account on March 25, 2025 and which accounts Mr. Geiger followed on that

particular day, and on that basis, deny each and every allegation in Paragraph 20.

21. Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations concerning Mr. Mayweather's alleged statements or statements from unnamed witnesses and on that basis, deny those allegations in Paragraph 21. Defendants deny the remaining allegations in Paragraph 21.

22. Defendants admit that the Article includes statements (a), (c) and (d). Defendants deny that statement (b) appears in the Article, as Plaintiff added the word "only". Defendants respectfully refer this Court to the full text of the Article (Ex. 4) for its full content and meaning. Defendants deny the remaining allegations in Paragraph 22.

23. Paragraph 23 of the Complaint contains legal conclusions that do not require a response. To the extent a response is required, Defendants deny each and every one of the allegations in Paragraph 23.

24. Defendants lack information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 24 and, on that basis, deny each and every one of those allegations.

25. Defendants deny each and every allegation in Paragraph 25. Mr. Geiger has authored a single article (not opinion piece) about Black real estate brokers between 2020-2024. That 2020 article, available at https://www.businessinsider.com/new-york-commercial-real-estate-lacks-diversity-calls-for-change-2020-6, highlights the failure of the industry's diversity initiatives. It neither concludes nor "infer[s] that major transactions by Black investors are publicity stunts." Defendants respectfully refer the Court to the article for its true content and meaning.

26. Defendants deny that Mr. Mayweather's team ever provided contact information for any tenant. Defendants deny the remaining allegations in Paragraph 26.

27.     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 27 and on that basis, deny each and every one of those allegations.

28.     Whether any particular conduct satisfies the "actual malice standard" is a legal conclusion for which no response is required.  To the extent a response is required, Defendants deny the allegation. Defendants deny the remaining allegations in Paragraph 28.

29.     Whether any particular conduct meets the "threshold" for intentional infliction of emotional distress is a legal conclusion for which no response is required.  To the extent a response is required, Defendants deny the allegation.  Defendants deny the remaining allegations in Paragraph 29.

30.     Defendants deny each and every one of the allegations in Paragraph 30.

31.     Defendants deny each and every one of the allegations in Paragraph 31 and deny that whether reporters do or do not "routinely" take certain steps in an investigation is relevant.

### FIRST CAUSE OF ACTION
**Defamation (Libel & Libel per se)**
(*Against All Defendants*)

32.     Defendants incorporate and repeat as if fully set forth herein its admissions, denials, averrals, and other answers to the allegations set forth in the above Paragraphs.

33.     Defendants deny each and every one of the allegations in Paragraph 33.

34.     Paragraph 34 contains legal conclusions that do not require a response.  To the extent a response is required, Defendants deny each and every one of the allegations in Paragraph 34.

35.     Paragraph 35 contains legal conclusions that do not require a response.  To the extent a response is required, Defendants deny each and every one of the allegations in Paragraph 35.

36.     Paragraph 36 contains legal conclusions that do not require a response.  To the extent a response is required, Defendants deny each and every one of the allegations in Paragraph 36.

## SECOND CAUSE OF ACTION
### Intentional Infliction of Emotional Distress / Harassment
(*Against Defendant Geiger*)

37.     Mr. Geiger incorporate and repeat as if fully set forth herein its admissions, denials, averrals, and other answers to the allegations set forth in the above Paragraphs.

38.     Paragraph 38 contains legal conclusions that do not require a response.  To the extent a response is required, Mr. Geiger denies each and every one of the allegations in Paragraph 38.

39.     Paragraph 39 contains legal conclusions that do not require a response.  To the extent a response is required, Mr. Geiger denies each and every one of the allegations in Paragraph 39.

40.     Paragraph 40 contains legal conclusions that do not require a response.  To the extent a response is required, Mr. Geiger denies each and every one of the allegations in Paragraph 40.

## THIRD CAUSE OF ACTION
### Prima Facie Tort (Malicious Harassment)
(*Against all Defendants*)

41.     Paragraph 41 contains legal conclusions that do not require a response.  To the extent a response is required, Defendants deny each and every one of the allegations in Paragraph 41.

## PRAYER FOR RELIEF

With respect to the Wherefore clause in the Complaint, Defendants deny that Plaintiff is entitled to any relief, including a judgment against Defendants, damages, profits, costs, expenses, attorneys' fees, interest, or any other relief.

## JURY DEMAND

42. Defendants demand a jury on all triable issues.

## GENERAL DENIAL

Each numbered paragraph in this Answer responds to the identically numbered paragraph in the Complaint.  Defendants deny allegations, declarations, claims, or assertions in the Complaint that are not specifically admitted in this Answer. To the extent that the headings contained in the Complaint constitute allegations, such allegations are denied.

## AFFIRMATIVE DEFENSES

Further responding to the Amended Complaint, Defendants assert the following defenses.  Defendants do not admit to having the burden of proof and/or the burden of persuasion with respect to any of these defenses.  By designating the following as defenses, Defendants do not in any way waive or limit any defenses that are or may be raised by their denials, allegations, and averments set forth herein.  The defenses are pleaded in the alternative, are raised to preserve Defendants' right to assert such defenses, and are raised without prejudice to the Defendants' ability to raise other and further defenses.  Defendants' reserves the right to amend, supplement, and/or otherwise modify this Answer, including without limitation the right to assert additional defenses that become known to it through discovery or otherwise.

## FIRST DEFENSE

The Complaint, and each of its claims for relief, is barred because it fails to state a claim upon which relief can be granted.

8

## SECOND DEFENSE

Plaintiff's defamation claim is barred because the challenged statements are true or substantially true and thus cannot be the basis for a defamation action.

## THIRD DEFENSE

Plaintiff's defamation claim is barred because at least one of the challenged statements is opinion and thus cannot be the basis for a defamation action.

## FOURTH DEFENSE

Plaintiff's defamation claim is barred because he is a public figure and cannot assert facts to show, by clear and convincing evidence, that Defendants acted with actual malice as to the publication of the challenged statements. Defendants had no reason to doubt the accuracy of the Article because Mr. Geiger conducted a thorough investigation, which included reviewing relevant documents and speaking to experts in the real estate industry and the New York City Housing Partnership, among other sources.

## FIFTH DEFENSE

Plaintiff's defamation claim is barred because, pursuant to New York Civil Rights Law § 76-a(2), this is an action involving public petition and participation, and Plaintiff cannot establish, by clear and convincing evidence, that Defendants acted with actual malice as to the publication of the challenged statement.

## SIXTH DEFENSE

To the extent Plaintiff brings a claim for defamation by implication, that claim is barred because the Defendants did not intend or endorse the purported implication of which Plaintiffs complain.

### SEVENTH DEFENSE

Plaintiff's defamation claim is barred because he has not suffered any actual harm or damages proximately caused by any of the challenged statements and any claimed damages are speculative and imprecise.

### EIGHTH DEFENSE

Plaintiff's claim for intentional infliction of emotional distress is barred Mr. Geiger did not engage in any outrageous conduct.

### NINTH DEFENSE

Plaintiff's claim for intentional infliction of emotional distress is barred because he has not suffered any actual harm or damages proximately caused by Mr. Geiger's alleged outreach to third parties and because any claimed damages are speculative and imprecise.

### TENTH DEFENSE

Plaintiff's claim for malicious harassment fails because New York does not recognize a tort for harassment.

### ELEVENTH DEFENSE

Plaintiff's claim for malicious harassment fails because Defendants did not engage in any malicious or harassing conduct.

### TWELFTH DEFENSE

Plaintiff's claim for punitive damages fails because the challenged statements were not made with common law malice, and Defendants did not publish the Article with hatred, ill will, spite, or in willful disregard of Plaintiff's rights.

## COUNTERCLAIM

Defendants and Counterclaimants Daniel Geiger ("Mr. Geiger") and Insider, Inc., (together, "Defendants") by and through their undersigned attorneys, Davis Wright Tremaine, LLP, hereby join in asserting this anti-SLAPP counterclaim under New York Civil Rights Law §§ 70-a and 76-a against Plaintiff and Counter-Defendant Floyd Mayweather Jr. ("Mr. Mayweather").

## INTRODUCTION TO THE COUNTERCLAIM

1.      Defendants realleges and incorporates by reference its responses to Paragraphs 1 through 42 of the Complaint in its Answer filed thereto.

2.      On March 31, 2025, Business Insider published the article "Floyd Mayweather Jr. bragged about a $400 million property deal. There's just one problem," written by Daniel Geiger and Ellen Thomas (the "Article"). *See* Ex. 4.  The Article describes how Mr. Mayweather's claim that he purchased a 62-building Manhattan apartment portfolio (the "Portfolio") outright – with no partners – does not appear to be substantiated by public records. Indeed, to date, New York City public property records have not recorded any change in ownership in any of the buildings in the Portfolio to Mr. Mayweather or to his real estate company, Vada Properties.

3.      As part of his reporting, Mr. Geiger reviewed public property records, and emailed, texted and/or spoke to over 8 sources, including two of Mr. Mayweather's own representatives.  Mr. Mayweather's associates informed Mr. Geiger that Mr. Mayweather himself would not be interviewed for the Article, and Mr. Geiger was never able to directly communicate with Mr. Mayweather for the Article.

4.      Notwithstanding that Mr. Geiger repeatedly asked Mr. Mayweather's representatives for any proof that Mr. Mayweather had, in fact, purchased the real estate Portfolio, the representatives never provided any such proof.

11

5.      Mr. Mayweather initiated this lawsuit against Defendants in April 2025. The Complaint is filled with demonstrably false allegations, including attributing statements to Mr. Geiger that he never made, as demonstrated by recordings of the very same calls Mr. Mayweather cites in his Complaint.  Based on these non-existent statements, Mr. Mayweather seeks to paint Mr. Geiger as racist and biased in a publicly filed Complaint simply to tarnish Mr. Geiger's reputation and chill further reporting about Mr. Mayweather.

6.      Mr. Mayweather has forced Defendants to defend themselves against meritless litigation, based on patently false allegations, arising from the publication of the Article and the newsgathering for that Article —a categorical exercise of First Amendment-protected speech on a matter of public concern.

7.      The First Amendment enshrines this nation's foundational commitment to the protection of free press.  Many states have put in place additional protections to ensure that citizens' First Amendment freedoms have the breathing space needed to survive.  One of these safeguards that has developed over recent decades is the adoption of anti-SLAPP laws. SLAPPs—Strategic Lawsuits Against Public Participation—are lawsuits used to inhibit the exercise of free speech and harass publishers by forcing them to spend money to defend against baseless suits.  These damaging suits chill free speech and the robust exchange of ideas and culture by targeting those who communicate about issues of public interest.  Multiple states— including New York—have passed anti-SLAPP laws to offer redress to targets of SLAPP suits.

8.      On November 10, 2020, New York's Governor signed Assembly Bill 5991-A into law, substantially expanding New York's existing anti-SLAPP law to provide greater protection to publishers against frivolous litigation intended to silence their exercise of the rights of free speech and petition about matters of public interest (the "Anti-SLAPP Law").  Specifically,

12

defendants in lawsuits "involving public petition and participation" (*i.e.*, SLAPP suits) may now file an action to recover damages, including costs and attorney's fees, from any person who "commenced or continued" such an action "without a substantial basis in fact and law . . . ." N.Y. Civil Rights Law § 70-a(1).

9.      This cause of action for damages provided for in the Anti-SLAPP Law is not a procedural mechanism.  It operates independent of the law's procedure for filing an Anti-SLAPP motion.  *See* N.Y. CPLR 3211(g).  Thus, the Anti-SLAPP Law established a new, *substantive* right under New York law to recover damages incurred in defending SLAPP suits.

10.     Critically, the Anti-SLAPP Law applies to lawsuits targeting "[a]ny communication in a place open to the public or a public forum in connection with an issue of public interest" or "any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest . . . ," with the term "public interest" defined "broadly" to "mean any subject other than a purely private matter."  N.Y. Civil Rights Law § 76-a(1)(a) & (d).  The Anti-SLAPP Law also provides for compensatory and punitive damages against plaintiffs who, like Mr. Mayweather, commence or continue meritless legal claims for the purpose of "harassing . . . or otherwise maliciously inhibiting the free exercise of speech []."  N.Y. Civil Rights Law §§ 70-a(1(b) and (c).

11.     The Article indisputably concerns a matter of public concern.  It focuses on the alleged purchase of affordable housing by a celebrity boxer.  The lawsuit was initiated purely as a means to discredit Mr. Geiger and his truthful reporting through false allegations.

12.     Mr. Mayweather has caused, and continues to cause, Defendants to expend significant costs and fees to defend its First Amendment-protected rights.

13.   Unless Mr. Mayweather is held accountable for his tortious activity, the purpose of the Anti-SLAPP Law will be frustrated.

## PARTIES

14.   Counterclaimant Insider, Inc. is a Delaware limited liability company with its principal place of business in New York.

15.   Counterclaimant Daniel Geiger is an individual domiciled in New York.

16.   Counter-Defendant Floyd Mayweather is an individual domiciled in Las Vegas.

## JURISDICTION AND VENUE

17.   Insofar as the Court has supplemental subject matter jurisdiction over Mr. Mayweather's state law claims, this Court also has supplemental jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1367.  Both this Counterclaim and Mr. Mayweather's state law claims arise out of the same common nucleus of operative facts—namely the newsgathering for and publication of the Article.  *Kriss v. Bayrock Grp. LLC*, 2017 WL 4023351, at *3 (S.D.N.Y. Sept. 12, 2017).  This Counterclaim further arises from the present litigation itself and the attempts by Mr. Mayweather to inhibit the Defendants' exercise of the constitutional right of free speech in connection with the Article, an issue of public interest.

18.   This Court has personal jurisdiction over the parties because they have each asserted claims in this action in courts of New York County, and because Mr. Mayweather transacts business within the state of New York in connection with the incidents giving rise to this action.

19.   Venue for this action properly lies in this district court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

14

20.    The laws of the State of New York apply to the subject matter of this action, because New York has the most significant relationship to this litigation:  the Article was written in New York,  about events taking place in New York, and published by a New York publication.

## FACTUAL BACKGROUND

21.    On February 21, 2025, Mr. Mayweather posted a video on Instagram, in which he announced he purchased an entire portfolio of 62 affordable housing apartment buildings in Manhattan.  Mr. Mayweather stated that "all the buildings belong to me.  I don't have no partners." *See* https://www.instagram.com/p/DGWOxVSySEa/?img_index=1.

22.    An editor at Business Insider became aware of Mr. Mayweather's announcement and asked Daniel Geiger, a seasoned real estate reporter at Business Insider, to look into the purchase.

23.    In early March 2025, Mr. Geiger spoke with a confidential source who questioned whether Mr. Mayweather's alleged $400 million deal had actually closed.

24.    Mr. Geiger then began researching the ownership of the 62 buildings that Mr. Mayweather allegedly purchased.  The buildings were listed on the website of Vada Properties, https://www.vadaproperties.com/portfolio[1], the real estate investment firm owned by Mr. Mayweather.  Mr. Geiger and Ellen Thomas, another reporter at Business Insider, took each address for the 62 buildings and looked up the corresponding property record on ACRIS (https://www.nyc.gov/site/finance/property/acris.page), New York City's publicly available online portal with New York City property records.

---

[1] The Vada Properties website was removed on or about October 8, 2025 after Defendants' counsel sent Plaintiff's counsel the letter attached as Exhibit 2.

25.    As one example, 311 West 114th Street is one of the apartment buildings included in the Portfolio, as indicated on the Vada Properties website. Mr. Geiger entered this address into ACRIS's tool "Find Addresses and Parcels" (https://a836-acris.nyc.gov/CP/LookUp/Index) and learned that the "Block" number is 01848 and the "Lot" number is "0007," as indicated below:



26.    Mr. Geiger then clicked on "Document Search by BBL," which returns all publicly available property documents about this building.  The report indicates that the documents are "To Current date" and reflect "All Document Classes."  Mr. Geiger then looked for the most recent deed to the apartment building, as that would indicate the owner of the property.  Here, the most recent deed is from October 2020, years before Mr. Mayweather claimed to have purchased the property.

## Search Results By Parcel Identifier

Current Search Criteria:

Borough: MANHATTAN / NEW YORK
Block: 01848
Lot: 0007    Unit: N/A
Date Range: To Current Date
Document Class: All Document Classes

Records 1 - 51 << previous  next >>    Max Rows 99 ✓    [ Search Options ] [ New BBL Search] [Edit Current Search] [View Tax Map] |Print Index|

| View | | Reel/Pg/File | CRFN | Lot | Partial | Doc Date | Recorded / Filed | Document Type | Pages | Party1 | Party2 | Party 3/ Other | More Party 1/2 Names | Corrected/ Remarks | Doc Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DET | IMG | | 2024000203428 | 7 | ENTIRE LOT | 12/15/2023 | 8/7/2024 9:19:12 AM | ASGN OF ASGN OF L&R | 36 | FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVED | SIG RCRS C MF 2023 VENTURE LLC | | ✓ | | 0 |
| DET | IMG | | 2024000203427 | 7 | ENTIRE LOT | 12/15/2023 | 8/7/2024 9:19:10 AM | ASGN OF ASGN OF L&R | 36 | FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVED | SIG RCRS C MF 2023 VENTURE LLC | | ✓ | | 0 |
| DET | IMG | | 2024000203426 | 7 | ENTIRE LOT | 12/15/2023 | 8/7/2024 9:19:09 AM | ASSIGNMENT, MORTGAGE | 37 | FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVED | SIG RCRS C MF 2023 VENTURE LLC | | ✓ | | 0 |
| DET | IMG | | 2024000203095 | 7 | ENTIRE LOT | 12/15/2023 | 8/6/2024 3:58:46 PM | ASGN OF ASGN OF L&R | 7 | FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVED | SIG RCRS C MF 2023 VENTURE LLC | | ✓ | | 0 |
| DET | IMG | | 2024000203094 | 7 | ENTIRE LOT | 12/15/2023 | 8/6/2024 3:58:45 PM | ASSIGNMENT, MORTGAGE | 8 | FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVED | SIG RCRS C MF 2023 VENTURE LLC | | ✓ | | 0 |
| DET | IMG | | 2022000182168 | 7 | ENTIRE LOT | 4/14/2022 | 5/3/2022 12:34:08 PM | AGREEMENT | 135 | 109TH AFFORDABLE HOUSING LLC | SIGNATURE BANK | | ✓ | | 189,382,048 |
| DET | IMG | | 2022000182167 | 7 | ENTIRE LOT | 4/14/2022 | 5/3/2022 12:34:07 PM | ASSIGNMENT OF LEASES AND RENTS | 106 | 109TH AFFORDABLE HOUSING LLC | SIGNATURE BANK | | ✓ | | 24,217,953 |
| DET | IMG | | 2022000182166 | 7 | ENTIRE LOT | 4/14/2022 | 5/3/2022 12:34:06 PM | MORTGAGE | 72 | 109TH AFFORDABLE HOUSING LLC | SIGNATURE BANK | | ✓ | | 24,217,953 |
| DET | IMG | | 2021000033026 | 7 | ENTIRE LOT | 10/16/2020 | 1/27/2021 1:06:47 PM | ASSUMPTION OF MORTGAGE | 22 | 114TH AFFORDABLE HOUSING LLC | SIGNATURE BANK | | ✓ | | 1,959,450 |
| DET | IMG | | 2020000315778 | 7 | ENTIRE LOT | 10/16/2020 | 11/13/2020 9:37:41 AM | AGREEMENT | 42 | HP MORNINGSIDE HEIGHTS PORTFOLIO HOUSING | THE CITY OF NEW YORK | | ✓ | | 0 |
| DET | IMG | | 2020000315775 | 7 | ENTIRE LOT | 10/16/2020 | 11/13/2020 9:37:38 AM | AGREEMENT | 23 | HP MORNINGSIDE HEIGHTS PORTFOLIO HOUSING | 114TH AFFORDABLE HOUSING LLC | | | | 0 |
| DET | IMG | | 2020000308479 | 7 | ENTIRE LOT | 10/16/2020 | 11/5/2020 1:17:05 PM | DEED | 7 | LH 311 WEST 114TH LLC | HP MORNINGSIDE HEIGHTS PORTFOLIO HOUSING | | ✓ | | 1,992,740 |

27.    Even though the deed is dated over four years before Mr. Mayweather announced his alleged purchase, Mr. Geiger wanted to confirm whether Mr. Mayweather or Vada Properties appeared anywhere on the deed. Unsurprisingly, they did not.

28.    Mr. Geiger and Ms. Thomas repeated these steps for each of the buildings in the Portfolio. They learned that the majority of the buildings were owned by Black Spruce, a real estate investment firm, with the remainder owned by the Orbach Group. None listed Vada Properties or Mr. Mayweather as the owner. This was true at the time the Article was written, and it remains true today. Further, the New York City Department of Finance recently reviewed non-public records for a sample set of the Portfolio and confirmed that there was no change in ownership.

29.    Mr. Geiger sought information from both Black Spruce and the Orbach Group about the alleged sales to Mr. Mayweather, but neither entity could confirm that Mr. Mayweather had, in fact, purchased any of the buildings in the Portfolio. Rather, as published in the Article,

Meyer Orbach, the CEO of the Orbach Group, did not respond to Mr. Geiger's outreach. A spokesperson for Black Spruce Management did not confirm that Mr. Mayweather had purchased the buildings but said that "Floyd Mayweather continues to be a reliable partner and a great ambassador for affordable housing. To date, Mayweather has performed on all of his obligations." *See* Ex. 4. Notably, Black Spruce did not specify what Mr. Mayweather's "obligations" were.

30. Mr. Geiger has been reporting on real estate for 21 years. During that time, he has learned that purchasers of 50% or more of real property (or of an LLC that owns property) must pay transfer taxes, Real Property Transfer Tax and Real Estate Transfer Tax. N.Y. Tax Law §§ 1201, 1402; *see also* https://www.nyc.gov/site/finance/property/property-real-property-transfer-tax-rptt.page; https://www.tax.ny.gov/pdf/publications/real_estate/pub576.pdf. Proof of transfer tax is typically filed on ACRIS. This is true whether or not the purchase is of an affordable housing property.

31. In Mr. Geiger's experience, once a purchase of a New York City property closes, there are documents publicly available on ACRIS showing the purchase and the new ownership, including the proof of the transfer taxes. Indeed, as the Article reports, and as Mr. Mayweather notably does not deny, "New York City property records, [] are usually updated within days of a sale." But, even today, New York City public property records on ACRIS do not show that Mr. Mayweather, or his company Vada Properties, have bought any of the buildings in the Portfolio.

32. Mr. Geiger was also aware from his many years of reporting that when someone purchases less than 50% of a property, there might not be a record of that sale on ACRIS.

33. As Mr. Geiger's investigation continued, he also learned more about the affordable housing market. Through his own research and conversations with sources, Mr. Geiger was told that in order to receive tax benefits and other financial incentives connected to the purchase of an

affordable housing building, a developer must partner with a housing nonprofit. The housing partnership becomes a member of the developer's LLC, under which the properties are held. For instance, the October 2020 deed for 311 West 114th Street indicates that the property was sold by Meyer Orbach to HP Morningside Heights Portfolio (an entity of the New York City Housing Partnership nonprofit) "as nominee for" 114th Affordable Housing LLC, a Black Spruce entity.

34.    Mr. Geiger therefore reached out to the New York City Housing Partnership to inquire about the alleged Mayweather deal. The NYC Housing Partnership had been involved with Black Spruce's initial acquisition of the majority of the apartment Portfolio that Mr. Mayweather claimed to have now purchased. According to a spokesperson, "[t]he Housing Partnership ha[d] not been advised of any sale, pending sale, or change in ownership. Generally, the partnership would be advised of the transfer and would be party to the transfer. That has not occurred." *See* Ex. 4. Notably, in his Complaint, Mr. Mayweather never denies that the New York City Housing Partnership generally would have been advised of a sale, had one occurred, but that it has not been advised of any such sale.

35.    Mr. Geiger also had two substantive calls with members of Mr. Mayweather's team, including Ayal Frist, the CEO of Vada Properties, and someone introduced as James McNair, one of Mr. Mayweather's business partners. Mr. Geiger recorded and transcribed these calls.

36.    The first call (Ex. 5) occurred on March 13, 2025. Mr. Frist and "Mr. McNair" requested that a portion of their conversation be kept off the record.

37.    After this phone call, Mr. Geiger looked online for videos of Mr. McNair. It became clear that the voice he heard on the phone did not match the voice in these videos. Mr. Geiger, therefore, became suspicious about whether he had been talking to the actual James

McNair – or if someone was impersonating him. Mr. Geiger suspected he was really speaking to Jona Rechnitz, a friend and associate of Mr. Mayweather, who had previously pled guilty to bribing the former head of the Correction Officers' Benevolent Association.

38.    On March 20, 2025, Mr. Geiger had another call with Mr. Frist and the man purporting to be Mr. McNair. Mr. Geiger confronted Mr. Mayweather's associates with what he had learned during the course of his investigation. First, he informed them that the New York City Housing Partnership was not aware of any sale to Mr. Mayweather. Second, Mr. Geiger explained that a bank stated it had no involvement in the buildings in the Portfolio, though "Mr. McNair" had previously "mentioned" that bank had purchased the loans. Mr. Mayweather's team could not explain either discrepancy. *See* Ex. 3 at 1-2.

39.    Mr. Geiger then raised the issue of whether he was really speaking with James McNair. When Mr. Geiger asked to have a video call in order to confirm who he was speaking to, "Mr. McNair" hung up the phone. *Id*. at 2-4.

40.    Also on March 20, shortly after Mr. Geiger's second call with Mr. Frist and "James McNair," Mr. Rechnitz sent an email to Mr. Geiger and Barbara Peng, the CEO of Business Insider, accusing Mr. Geiger of lying and acting unethically. Mr. McNair, who was also on the email chain, rejected Mr. Geiger's request for a video call. See Exs. 6, 7.

41.    Importantly, at no time did Mr. Geiger, as the Complaint alleges, "refuse" to review transaction documents about the Portfolio. Instead, later on March 20, 2025, even after "Mr. McNair" hung up on Mr. Geiger, and after Mr. Rechnitz accused Mr. Geiger of "lying," Mr. Frist and Mr. Geiger continued communicating over email. Mr. Geiger asked if Mr. Frist could "provide some proof of the acquisitions." *See* Ex. 1. In response, despite previously stating that he "ha[d] the loan docs," (Ex. 8) Mr. Frist wrote "[y]ou should contact black spruce

for that kind of ask they have all the records." *See* Ex. 1.  Despite Mr. Geiger's request, Mr. Frist never provided the "loan docs" he said he possessed or any other documentation that evidenced the sale of the Portfolio.

42.    While Mr. Mayweather's associates refused to provide the transaction documents, Mr. Geiger continued investigating.  As reported in the Article, on March 21, 2025, a source directly involved with the Portfolio told Mr. Geiger confidentially that "Mayweather had purchased a small minority ownership in the portfolio, with options to expand that stake over time or acquire the buildings in their entirety." *See* Ex. 4.  That is, Mr. Mayweather had an ownership stake in the Portfolio, but did not own it outright, as he had claimed.  This explanation made sense to Mr. Geiger, because, as noted above, if Mr. Mayweather only had a minority ownership in the Portfolio, that ownership interest might not be recorded in the public real estate records.

43.    In addition, at some point during the week of March 24, 2025, Mr. Geiger spoke with two title insurance experts who both informed him that had there been a sale of the type Mr. Mayweather claimed, there would have been documents confirming Mr. Mayweather's ownership. These confidential sources each independently explained that these documents would have been available soon after the closing.  But Mr. Geiger found none.

44.    On March 26, 2025, a representative from the Department of Finance also confirmed to Mr. Geiger that a "[deed] is available on ACRIS "the same day or the next day" [after a closing].  Ex. 9.  But, again, Mr. Geiger found none.

45.    Mr. Geiger, therefore, learned prior to publication, among other things, the following information:

a.    If a buyer purchases 50% or more of real property, or 50% or more of an interest in an LLC that owns property, there generally is a public record of the purchase on ACRIS;

b.    That public record typically appears within a few days of closing;

c.    There was no documentation on ACRIS of a sale to Mr. Mayweather for any of the 62 properties in the Portfolio as March 31, 2025, the date of the Article's publication, even though Mr. Mayweather announced the purchase of the buildings in February 2025;

d.    Mr. Mayweather's associates did not provide any transaction documents that confirmed any sale of the Portfolio to Mr. Mayweather;

e.    A source directly involved with the Portfolio said Mr. Mayweather only owned a minority interest in the Portfolio;

f.    A spokesperson for the New York City Housing Partnership said if there had been any transfer of ownership, they would have been alerted; and

g.    The New York City Housing Partnership had not received any such notice.

46.    Based on this and related reporting, the Article was published on March 31, 2025. At the time the Article was published, and today,  Defendants believed the Article was accurate. The Complaint falsely alleges otherwise.

47.    The Complaint also falsely states that Mr. Geiger made various specific racist comments during his calls with Mr. Mayweather's associates.  As is clear from the transcripts

themselves,[2] Mr. Geiger did not make any of the statements attributed to him in the Complaint. *Compare* Compl. ¶¶18-19 *with* Exs. 3, 5.  Those allegations in the Complaint appear to be made up out of whole cloth.

48.     In addition, the Complaint takes issue with Mr. Geiger's assertion that he did not believe he had spoken to Mr. McNair.  But Mr. Geiger's belief is well founded.  Indeed, Mr. Geiger's suspicions were reinforced during text exchanges with Mr. Rechnitz.  Specifically, on April 10, 2025, Mr. Rechnitz wrote the following to Mr. Geiger in a text conversation:



49.     The reasonable implication of the "wink face" emoticon is that there was in fact no "chat . . . with James," because Mr. Rechnitz was pretending to be "James."  Moreover, on

---

[2] Defendants have attached a redacted version of the March 13, 2025 call (Ex. 5) to honor the request made to keep certain information off the record.  Defendants believe that any confidentiality was waived because (1) the agreement to keep this information confidential was made between Mr. Geiger and someone purporting to be Mr. McNair, and (2) the agreement was made by Mr. Mayweather's representative, and Mr. Mayweather has now sued based on – and his Complaint fabricates - statements that were not made during this call.  Nonetheless, for this public filing only, Defendants will redact that information.  For the sake of clarity, the statements attributed to Mr. Geiger in the Complaint do not appear in the redacted portion of the transcript.  Defendants welcome an opportunity for the Court to review the fully unredacted transcript *in camera* to verify Defendants' representation.

April 16, Mr. Geiger texted Mr. Rechnitz "In the story I recently wrote [the Article], didn't I reflect many of the things that u conveyed? What a minute – did I say u? I meant to say James McNair, I slipped up sorry about that," to which Mr. Rechnitz replied with another "wink face."



This reaction suggests that Mr. Rechnitz is in fact in on the joke, a tacit acknowledgement that Mr. Geiger never spoke with Mr. McNair. Indeed, even the Complaint does not deny Mr. Geiger's observation that the voice of the person he spoke with did not sound like that of Mr. McNair.

50.     On April 30, 2025, Mr. Mayweather filed the present action against Insider and Mr. Geiger. There was no attempt to prosecute this claim until July 15, 2025, when counsel for Mr. Mayweather first filed his pro hac vice application. Despite the same-day notification from the Clerk's Office that the motion was deficient, Mr. Mayweather's counsel did not refile his motion until August 21, 2025, more than two weeks after the deadline to serve the Complaint under the Federal Rules of Civil Procedure. The pro hac vice order was granted on August 22, 2025, at which point Mr. Mayweather belatedly served the Complaint.

51.     The Complaint is meritless and filed only to intimidate and chill Defendants'

reporting on Mr. Mayweather.  Critically, the four allegedly defamatory statements (*see* Compl. ¶

22) are substantially true or otherwise protected statements of opinion.  Public documents,

supported by information provided by confidential sources, demonstrate that the Article's

statement "[t]here is no evidence there has been a sale" is substantially true.  The Complaint does

not deny that New York property records should, but do not, reveal that any of the 62 apartment

buildings have changed ownership.

52.     Similarly, it is clear the statement that Mr. Mayweather's claims about his real

estate "appear exaggerated" is  Mr. Geiger's opinion based on the fact that, as reported in the

Article, public records do not reflect any sale of the Portfolio to Mr. Mayweather.

53.     In addition, the Complaint must, but cannot, plausibly allege that Defendants

published each of the statements with actual malice.  Defendants believed then, and believed

now, that Mr. Mayweather does not fully own each of the 62 apartment buildings.  Because, as

explained above, in Mr. Geiger's experience, a purchase of 50% or more of real property is

typically recorded, and because there was no such recording of a sale to Mr. Mayweather,

Defendants reasonably believed that no such sale had occurred and Mr. Mayweather's claims to

the contrary were "exaggerated."

54.     There are also no plausible allegations that Defendants had any reason to doubt

the information provided by Mr. Geiger's sources, which are among the challenged statements.

That the New York City Housing Partnership "had not been advised of any sale" is a direct quote

from a spokesperson for the Housing Partnership.  And the Complaint does not deny that the

Housing Partnership should have been notified of any sale.  Similarly, that Mr. Mayweather "had

purchased a small minority ownership interest in the portfolio" was relayed to Mr. Geiger by "a

person directly involved in the deal with Mayweather," *see* Ex. 4, and is consistent with the absence of any property records indicating a change in ownership. Mr. Mayweather has not, and cannot, allege that Mr. Geiger had any reason to doubt the reliability of the information provided by these sources.

55.     The Complaint's other allegations further reveal that it was filed only to harass Mr. Geiger.  The Complaint includes fabricated racist views and false animus against Mr. Mayweather's political opinions.  Further, as evidenced by the preceding paragraphs, the allegation that Mr. Geiger failed to conduct an investigation into the transaction at issue is also demonstrably false.  To the contrary, Mr. Geiger thoroughly investigated this story and had every reason to believe in the truth of the reporting.

56.     In sum, Mr. Mayweather's claims arise out of and target the creation and publication of an article on a public figure, and are without any substantial basis of fact or law. In light of this, on October 1, 2025, Defendants' counsel sent a letter to counsel for Mr. Mayweather identifying certain false allegations and asking for proof of their claims.  *See* Ex. 2. Mr. Mayweather's counsel never responded to the letter.

## COUNT 1

### (VIOLATION OF N.Y. CIVIL RIGHTS LAW §§ 70-a, 76-a)

57.     Pursuant to New York Civil Rights Law § 70-a,  Geiger and Insider are entitled to maintain a counterclaim to recover their costs, attorneys' fees, compensatory damages, and punitive damages in this action.

58.     This action commenced by Mr. Mayweather is an "action involving public petition and participation," as defined by N.Y. Civil Rights Law Section 76-a, because it is based upon a communication in a public forum in connection with an issue of public interest, as well as

26

lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest. N.Y. Civil Rights Law § 76-a(a)(1)-(2).

59.     The Article is a matter of public interest.

60.     Mr. Mayweather commenced this action against Mr. Geiger and Business Insider even though his claims lacked any basis in fact and law and could not be supported by any argument for the extension, modification or reversal of existing law.

61.     The claims asserted in the Complaint are without factual basis for the reasons set out above.

62.     The claims asserted in the Complaint are without legal basis. Among other reasons, the defamation claim fails because the allegedly false statements are in fact substantially true. In addition, the statement "[t]he deal is one of several claims Mayweather has made about his real estate that appear exaggerated" is protected opinion. Further, Defendants did not publish the allegedly defamatory statements with actual malice. The Complaint attempts to manufacture actual malice through fabricated quotes and demonstrably false allegations.

63.     The IIED and malicious harassment claims were also asserted in violation of New York's anti-SLAPP law. Under the anti-SLAPP, claims based upon "any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest." N.Y. Civ. Rights Law § 76-a(1)(a)(1) and (2). Thus, claims arising from the *creation* of the Article – including the reporting and investigation – fall within the law's scope. Mr. Mayweather's additional claims arise from conduct allegedly undertaken in furtherance of the Article's publication. Mr. Mayweather effectively asserts that Mr. Geiger's lawful newsgathering intentionally inflicted severe emotional distress. That Mr. Mayweather was unhappy with Mr. Geiger's outreach is not grounds to try and stifle Mr. Geiger's reporting. It is

27

no coincidence that this baseless claim was asserted while Mr. Geiger was in the process of investigating a second story about Mr. Mayweather.

64. The "malicious harassment" claim violates the anti-SLAPP law for the same reason. And, moreover, no such tort exists under New York law. *Dinkins v. New York*, 2021 WL 3173968, at *11 (S.D.N.Y. July 26, 2021) ("[Q]uite simply, there is no such thing as an independent tort for harassment under New York State law"); *Bouchard v. New York Archdiocese*, 2006 WL 1375232, at *4 n.4 (S.D.N.Y. May 18, 2006) ("[T]o the extent Plaintiff is attempting to assert a claim for common-law harassment, no such claim can be maintained, as there is no cognizable common-law claim for malicious harassment in New York.").

65. Mr. Mayweather was fully aware that his claims against Defendants have no substantial basis in law or fact, yet he commenced and continued this action for the purpose of harassing, intimidating, punishing, or otherwise maliciously inhibiting their free exercise of speech.

66. Accordingly, pursuant to New York Civil Rights Law § 70-a, Defendants are entitled to assert a counterclaim and to recover their costs, attorneys' fees, compensatory damages, and punitive damages in this action.

**PRAYER FOR RELIEF**

WHEREFORE Defendants pray for judgment as follows:

1. That Mr. Mayweather be denied the requested relief he seeks in this action;

2. That judgment on Mr. Mayweather's claims be entered in favor of Mr. Geiger and Insider and against Mr. Mayweather; and

3. That judgment on the Counterclaim be entered in favor of Mr. Geiger and Insider and against Mr. Mayweather;

28

4.      That Mr. Geiger and Insider be awarded their reasonable costs, attorneys' fees, and disbursements pursuant to New York Civil Rights Law Section 70-a or otherwise.

5.      That, pursuant to New York Civil Rights Law Section 70-a, Mr. Geiger and Insider be awarded punitive damages; and

6.      For such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       October 10, 2025

                            Respectfully submitted,

                            DAVIS WRIGHT TREMAINE LLP

                            By: */s/ Elizabeth A. McNamara*
                                Elizabeth A. McNamara
                                Rachel Strom
                                Hilary Oran

                            1251 Avenue of the Americas, 21st Floor
                            New York, NY  10020-1104
                            (212) 489-8230 Phone
                            (212) 489-8340 Fax
                            lizmcnamara@dwt.com
                            rachelstrom@dwt.com
                            hilaryoran@dwt.com

                            *Attorneys for Defendants*
                            *Daniel Geiger and Insider, Inc*